(Decided 12th June, 1889.)

---

## FRANCES CORNELIA TALIAFERRO *vs.* THE FIRST NATIONAL BANK OF BALTIMORE.

*Principal and Agent—Negotiable instruments—Ratification and Confirmation—Usage or Custom—Waiver.*

An attorney having been intrusted with certain registered Virginia coupon consols, to be sold when a specified price could be obtained for them, he procured printed forms of transfers and powers of attorney for each bond, and caused them to be signed in blank by the owner of the bonds. The attorney pledged the bonds to a Bank as collateral for his own debt, without the knowledge of his principal; and the Bank sold them without the endorsement of the principal. HELD:

1st. That the blank assignment, with power of attorney to sell and transfer the securities did not operate as an endorsement of them to the attorney, and upon its face not being an authority to pledge, the Bank took them with no better title than the attorney himself possessed; and with distinct notice, imparted by the instruments and the power of attorney. that there was ground to question whether the attorney was authorized to deal with them as he did.

2nd. That the endorsement of the securities by the principal after they had been sold, in ignorance that they had been pledged by the attorney, was neither a ratification of the act of the attorney, nor a confirmation of the sale made by the Bank.

Registered Virginia coupon consols, whether treated as bonds or certificates of indebtedness, or as promissory notes, are not negotiable without endorsement.

A usage or custom obtaining on the stock exchange, and among bankers and brokers. as to the form and character of transfers required to put a particular class of securities in condition for delivery, and to pass title to them, is sufficient to put a Bank upon inquiry as to ownership, if such usage has not been observed; but this usage or custom cannot be proved by merely showing the rules of the stock exchange.

The receipt by the principal of a part of the money realized by the Bank from the unauthorized sale of the securities, cannot be construed into a waiver of the right to demand the balance, or be held as a confirmation of the wrongful act of the Bank.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*First Exception.*—The plaintiff offered to prove by Sterrett McKim, that he was a member of the New York Stock Exchange, and also of the Baltimore Stock Exchange, and that he had informed himself as to what their rules were in 1886; to prove further by the same witness, and by the printed books of such rules which he would identify, what these rules were, and particularly that by Article 15, section 3, of the constitution and by-

laws of the Baltimore Stock Exchange, in force in 1886. that reads as follows:

"All bonds sold at this exchange, unless otherwise specified, must be a good delivery according to the rules of the New York Stock Exchange at the time of sale."

And that by the rules of the constitution of the New York Stock Exchange, in force in 1886, the latter part of section 4, of article 6, reads as follows:

"Detached powers of attorney, or substitution, must be attested by a notary public, under seal."

And that Article IX, of the same constitution, reads as follows:

"Whenever the transfer books of any company shall be closed by any legal impediment, so as to render their being open again uncertain, then the deliveries of stock of such company, in satisfaction of contracts, shall be by certificate and power of attorney irrevocable, with notarial acknowledgment and seal ; and containing assignment and bill of sale, the papers to be satisfactory to the recipients or passed upon by the Committee on Securities."

And that the powers of attorney exhibited and in evidence in this case are detached powers under the meaning of the above mentioned rules.

And further offered to show in connection with the above that Mr. John A. Hambleton, one of the directors of the defendant Bank, is a member of the Baltimore Stock Exchange, and conversant with its rules and customs.

The Court (HARLAN, J.,) rejected the evidence as offered, and declined to permit the same to go to the jury. The plaintiff excepted.

*Second Exception.*—After offering the evidence set out in the aforegoing first exception, the plaintiff renewed the offer to prove by said witness, McKim, the facts set forth as to be proved by him in said first exception; and further offered to follow up said evidence by proof, that

Taliaferro *vs.* First National Bank of Baltimore.

Joseph A. Sprigg was president of the defendant Bank in 1886, at the time of the transactions with I. Parker Veazey, which are complained of, and that he was the officer of the Bank with whom said Veazey dealt in said transactions, and that said Sprigg was at the time of said transactions a member of the Baltimore Stock Exchange, and conversant with its rules and customs.

The Court rejected the evidence so offered, and the plaintiff excepted.

*Third Exception.*—After offering the evidence set out in the first and second exceptions the plaintiff asked the said witness, McKim, the following question:   Was there or not a general usage among bankers and brokers in the City of Baltimore, as to what should be an authentication of an assignment or power of attorney of a registered consol coupon bond (of the character of bond, of which a copy had been offered in evidence and shown to witness,) of the State of Virginia, payable to order, and issued under the Act of 1871, since the year 1882?   This question was objected to by the defendant, and the Court refused to allow it to be put to the witness.   The plaintiff excepted.

*Fourth Exception.*—The plaintiff further offered evidence by said witness, McKim, as follows:

Do you know whether or not there was a general uniform usage among all people dealing in Registered Virginia consol coupon bonds, issued under the Act of 1871, since 1882, in regard to the authentication of the signatures to any assignment or power of attorney given with the same; what is the custom among all the people that you know that deal in those securities?

In regard to the usage of all people, I, of course, can't answer.

What do you mean by that answer?

I mean, sir, that I know the usage of brokers and bankers in this city and in New York, and the generally

accepted form in the other cities where these bonds are dealt in; the usage is the same in Baltimore and New York; I will say this First National Bank dealt in these bonds——

Whereupon defendant's counsel objected, and asked that the witness' testimony be ruled out about the First National Bank, and the Court sustained the objection, and ruled out said evidence.    The plaintiff excepted.

*Fifth Exception.*—The plaintiff offered evidence by the witness, William B. Wilson, as follows:    Do you know whether Mr. Sprigg was a member of the Baltimore Stock Exchange?    The defendant objected.    The Court sustained the objection, and the plaintiff excepted to the ruling of the Court in refusing to allow the witness to answer the question.

*Sixth Exception.*—The plaintiff having closed her case, and the defendant having offered no evidence, the latter moved the Court to strike out of the case the evidence of Frank Ruffin, in regard to what would be required by him as evidence in connection with the funding of the bonds; and to strike out the evidence of Sterrett McKim, J. Harmanus Fisher, John A. Whitridge, and John Redwood, on the subject of usage.    The Court granted the motions, and the plaintiff excepted.

*Seventh Exception.*—The defendant, at the request of the Court, offered two prayers, the first of which is contained in the opinion of this Court, and the second is as follows:

2. If the jury find all the facts stated in the preceding prayer, and that afterwards the assignment and powers of attorney offered in evidence were surrendered up to the plaintiff by the purchaser of the obligations of the State of Virginia, and that in consideration thereof, and before this suit was brought, the plaintiff endorsed the instruments to bearer, and redelivered them to the agent of the purchaser, then the plaintiff cannot recover under the pleadings in this action.

Taliaferro *vs.* First National Bank of Baltimore.

The Court granted the first prayer and rejected the second. The plaintiff excepted to the granting of the defendant's first prayer. The verdict and judgment were for the defendant, and the plaintiff appealed.

The cause was argued before ALVEY, C. J., STONE, MILLER, IRVING, BRYAN, and McSHERRY, J.

\*_J. S. T. Waters, Frederick W. Brune,_ and _Stewart Brown,_ for the appellant.

_J. Alexander Preston,_ and _William A. Fisher,_ for the appellee.

McSHERRY, J., delivered the opinion of the Court.

Miss Frances Cornelia Taliaferro and her sister, Mrs. Sarah L. Waters, each owned $8600 of registered Virginia coupon consols, payable to them respectively or to their respective order. Wishing to dispose of these securities as soon as the market price should reach sixty cents on the dollar they entrusted them to I. Parker Veazey *for sale.* He procured printed forms of transfers and powers of attorney—one for each bond—and caused Miss Taliaferro and Mrs. Waters to sign them in blank. The blanks were thereafter partially filled up by Veazey, and when so filled up the instruments read as follows: (the italics indicating the written portion.) "Know all men by these presents that _I, Frances Cornelia Taliaferro,_ ——— for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto ——— _one thousand dollars of the registered debt of the Commonwealth of Virginia, issued under the Act approved the 30th day of March,_ 1871, standing in _my_ name on the books of the said _Commonwealth of Virginia, as per certificate_

\*Mr. Waters, although present, did not take part in the argument.

*number* (2838) *twenty-eight hundred and thirty-eight* ———
I do hereby constitute and appoint ——— *my* true and
lawful attorney, irrevocable for *me* and in *my* name and
stead, but to ——— use, to sell, assign, transfer and set
over; all or any part of said stock, and for that purpose
to make and execute all necessary acts of assignments
and transfers, and one or more persons to substitute with
like full power, hereby ratify and confirm all that *my*
said attorney or ——— substitute or substitutes shall
lawfully do by virtue hereof.    In witness whereof *I*
have hereunto set *my* hand and seal, the 16*th* day of
*April*, 1886.    *Frances Cornelia Taliaferro.*    (Seal.)''

Shortly after signing these assignments and powers of
attorney, the appellant went to the country for the sum-
mer.    On Sunday, August the 15th, 1886, Mrs. Waters
was informed by a letter from I. Parker Veazey that
these bonds had been hypothecated, but she does not
seem to have understood the meaning of that transac-
tion, and she made no communication of it to the appel-
lant until the following day, when she merely showed her
the letter.    On Monday, the 16th, Mrs. Waters went to
I. Parker Veazey's house, but failed to see him.    Sub-
sequently on the same day Duncan Veazey, a brother of
I. Parker Veazey, called upon her at the house of her aunt
and informed her that the bonds had been sold by the
bank, but he did not name the bank; he said to her, ''the
bonds have been sold by the bank which they had a per-
fect right to do;'' and he stated that the sale had been
made through Wilson, Colston and Company.    Duncan
Veazey further told her that the bonds would sell for
more in Richmond than they had brought in Baltimore,
and that this extra amount, if secured in Richmond,
would be under the control of I. Parker Veazey, and
would pass to her and her sister; but that in order to
effect this result, the powers of attorney already executed,
would have to be acknowledged before a notary public by

ten o'clock the next morning. She was urged to acknow-
ledge them immediately. She accordingly did so and
sent by the notary to Miss Taliaferro, who was still in
the country, such of the powers of attorney as were to
be acknowledged by her. This was done by Miss Talia-
ferro. The bank then paid over to Duncan Veazey for
I. Parker Veazey the sum of $2094.67, being the increase
in price which Wilson, Colston & Co. obtained upon a
sale of these securities in Richmond. About the first
of September following, the securities were sent from
New York to the notary who had taken the acknowledg-
ments referred to, and he was requested to procure the
endorsements of Miss Taliaferro and Mrs. Waters respec-
tively upon the securities themselves, and to take their
acknowledgments thereto under his seal. This was
effected by him.

It is perfectly clear from the record that Miss Talia-
ferro certainly never comprehended during all these occur-
rences how her securities had been acquired or disposed
of by the bank, or what was meant by their hypothe-
cation. When she realized that Veazey had pledged
them to the bank as collateral for his own debt, and had
therefore deliberately misapplied them, and that the
bank had sold them, she brought an action of trover
against the bank for their value. The trial resulted in
a judgment against her, and from that judgment she
has prosecuted this appeal.

On the 17th of August, Lyle, who was then the dis-
count clerk of the First National Bank, but who is now
"in Mexico, Canada or somewhere" beyond the jurisdic-
tion of the Courts of Maryland, took these securities to
Wilson, Colston & Co., brokers in the City of Baltimore,
and stated that he wished them sold at once. These
gentlemen bought them that day from the bank at private
sale for thirty-six cents on the dollar. On the very same
day Duncan Veazey was informed by Mr. Sprigg, the

President of the appellee bank, and by Lyle that the securities were in a condition to be properly delivered in Baltimore, but not in Richmond, and Lyle handed the original powers of attorney to Duncan Veazey that he might have them acknowledged before a notary public.

I. Parker Veazey had no title whatever to these securities. They did not belong to him. They had been entrusted to him *for sale.* Whether they are what they are styled on their face, bonds or certificates of indebtedness, or, whether they are merely promissory notes, as insisted by the appellee, they were not negotiable in the condition in which Veazey first received them. Upon their face they disclosed the fact that he was not the owner. The blank assignment and power of attorney did not operate as an indorsement of them to him. It was a power to sell and not a power to pledge. It can by no possible construction be made to appear to be a power to pledge for debt. Waiving all inquiry as to its defective condition on account of its blanks, it could never have any greater effect than to authorize Veazey to fill up the blanks according to the authority given by the party who executed it. The very face of the instrument shows that it authorized the attorney to bargain and sell and transfer to *blank,* but not to pledge for debt. Any one taking this instrument must necessarily see this. A power to sell does not authorize the agent to pledge for his own debt the thing which he was employed to sell. *Story on Agency, sec.* 78; *Byles on Bills,* 25; *Merchants Bank vs. Livingston,* 74 *N. Y.,* 223; *Haynes vs. Foster,* 2 *Cromp. & M.,* 237.

If these Virginia securities be promissory notes, and they possess many, if not all the characteristics of such instruments and are not under seal, the assignments and powers of attorney accompanying them did not make them negotiable, because such an effect results only from a transfer according to the law merchant; that is, from

an indorsement.    An assignee stands in the place of his assignor and takes simply an assignor's rights; but an indorsement creates a new and a collateral contract.    2 *Par. Notes & Bills*, 46; *Trust Co. vs. National Bank*, 101 *U. S.*, 68; *Whistler vs. Forster*, 14 *C. B.*, (*N. S.*,) 248; *Losee vs. Bissell & Co.*, 76 *Pa. St.*, 459; *Lancaster Nat. Bank vs. Taylor*, 100 *Mass.*, 18.    Treating them, then, as promissory notes of the State of Virginia, Veazey did not take them as indorsee, and, as already stated, he took no interest in them at all, as assignee.    The bank claiming through and from him took, therefore, no better title than Veazey had.    "It is," says Lord Justice COTTON in *Williams vs. Colonial Bank*, *L. R.*, 38 *Ch. D.*, 399, "unnecessary to refer to authorities in English law to show that no one can transfer a better title than that which he possesses to a chattel *or to an instrument which is not negotiable.*"    See also *Levi vs. Booth*, 58 *Md.*, 305.    The assignment and power of attorney not amounting to an indorsement of the securities and, therefore, not converting them into negotiable instruments, and upon its face not being an authority to pledge, the bank took them as collateral for Veazey's debt to itself with no better title than Veazey himself possessed.    It took them, too, with distinct notice, imparted by the instruments and the powers of attorney, that there was ground to question whether Veazey was authorized to deal with them as he did.    It is consequently not in the position it would have occupied had these securities been duly indorsed.    It had, at least, "reason to suspect" that Veazey's "authority was of a restricted character," *Haynes vs. Foster*, 2 *Cromp. & M.*, 237; and that suspicion was sufficient to have put it upon inquiry, because the securities were not negotiable when taken by it.    Or in the more apt language of Lord BRAMWELL in *Earl of Sheffield vs. London Joint Stock Bank*, *L. R.*, 13 *Ap. Ca.*, 346, it had "notice of the infirmity of the pledgor's title, or of such facts

and matters as made it reasonable that inquiry should be made into such title." When properly indorsed nothing short of actual notice or knowledge can affect the title of the holder of negotiable paper which has been acquired for value before maturity. *Williams vs. Huntington,* 68 *Md.,* 600.

It does not appear at what time the bank received these securities from Veazey, or whether it took them as collateral for an antecedent debt or for a loan made upon the faith of them; but it is certain beyond all question they were delivered by Veazey to the bank and sold by the bank to the brokers at private sale *before* the notary's certificate was obtained or attached to the powers of attorney. Regarding these securities as promissory notes the bank knew, or was bound to know, when it took them as collateral for Veazey's debt that Veazey had, under the circumstances stated and the information disclosed on the face of the papers, no unimpeachable legal title to them. It consequently took no better title than Veazey had; and he had none.

It has been insisted, however, that the title acquired by an assignee of a promissory note is just as valid against the world as that of an indorsee, save as respects equities and defences which the *maker* may have and may avail of when sued by an assignee. If this were conceded it would destroy all distinction between an indorsement and an assignment except in the single instance indicated. But the question before us is not one involving the right of the maker to defend against the claim of the bank; it is one of *title* to the securities. Miss Taliaferro was confessedly the owner of them when she delivered them to Veazey *for sale,* and she continued to be the owner of them. His delivery of them to the bank was a flagrant breach of his restricted authority. He was not an assignee of them, he had no title to them at all, and it was never intended that he should have. Receiving them from him

Taliaferro *vs.* First National Bank of Baltimore.

under the circumstances mentioned, the bank could take no better title than he had. Without subverting the most firmly established principles it is not possible to hold that the bank acquired from Veazey a title which he never had—a title good against the legal owner—when by assignment it could not under any circumstances take one superior to that which its assignor possessed. An assignee stands in the place of the assignor with no greater rights than the latter had. If he had none neither can it have.

On the other hand, treating these Virginia consols as registered bonds, though they do not answer the technical definition of a bond, then, in the absence of an assignment on the bonds themselves, and in view of the usage and custom existing in Baltimore in regard to them—a usage and custom which will be considered in a moment— the title of the owner was not divested by these unacknowledged transfers and powers of attorney; and the bank was not at liberty to deal with them as though they had been bonds which pass by mere delivery. The bank was, therefore, put upon inquiry, and for its own protection was bound to know when accepting these securities as collateral for the debt of Veazey, whether they were Veazey's property. Independently of the facts disclosed on the face of the securities, the assignment and the power of attorney, a usage or custom, if one prevailed on the Stock Exchange and among bankers and brokers of Baltimore, as to the form and character of transfers required to put these securities in condition for delivery and to pass title to them, was sufficient to put the bank upon inquiry as to Veazey's title provided that usage had not been observed. A usage requiring these registered consols to be transferred in writing and to be accompanied by a power of attorney acknowledged before a notary public, and considering them as "not in order" or deliverable unless in that condition, was

Taliaferro *vs.* First National Bank of Baltimore.

material to be known by the jury in the trial of the cause as affecting the title acquired by the bank. In the case of *Williams vs. Colonial Bank, supra,* it was shown that Mr. Williams owned a large number of shares of the capital stock of · the New York Central and Hudson River Railroad Company represented by certificates standing in his name. Upon his death in England his executors after proving his will, signed upon the back of these certificates transfers and powers of attorney very similar to the one we are dealing with in this case, leaving the name of the assignee and of the attorney blank. They delivered these certificates to a firm of brokers for transmission to America, that new certificates might be issued in the names of the executors, upon the surrender of the old ones. One of the firm of brokers pledged the certificates with the bank as collateral for a loan instead of forwarding them to this country. Afterwards the firm went into liquidation, and the executors made demand on the bank for the stock. Their demand having been refused they instituted suit. Considerable testimony was adduced to show that by the usage and custom of the London Stock Exchange such certificates of stock assigned, but unattested by a consul were not regarded as in proper order; and Lord Justice COTTON in the course of the opinion delivered by him observed: " If parties will without inquiry take documents which have on their face anything to put the takers on inquiry, they take them at their own risk, and if those from whom they take the documents have not a good title which they can transfer, then the transferees do not acquire a good title, although at the time when they take the documents they do not in fact know of the real title of those who now assert it. There was a mass of evidence with regard to the practice in England as to these transfers, and in my opinion it comes to this, that if there was a

signature only in this form not attested by a consul, the documents would not according to the ordinary course of the stock exchange be taken as transfers. It appears that some persons in business on the stock exchange pay no regard to such a defect, but upon the whole of the evidence an absence of attestation before a consul would make the documents 'not in order,' and in my opinion would put any one dealing with them on inquiry as to the circumstances under which they were brought to him. The case is within the observations of Lord SEL-BORNE in *Société Générale de Paris vs. Walker*, (11 *App. Cas.*, 20,) where it was held that the effect of the absence of a certificate of English shares was to put parties on inquiry, and if there was an absence of that certificate, although there was a transfer of the shares duly executed, those who took it without the certificate took it under such circumstances that they could not be said to take it as purchasers for value without notice." In further support of the proposition that evidence is admissible to show a usage or custom obtaining on the stock exchange, and amongst bankers and brokers as affecting the relation of the parties to the subject-matter in issue, we refer to *Appleman vs. Fisher & Sons*, 34 *Md.*, 540; *Goodwin vs. Robarts, L. R.*, 1 *App. Cas.*, 476; *London and County Banking Company vs. London and River Plate Bank, L. R.*, 20 *Q. B. D.*, 232. It was competent to trace knowledge of this usage and custom to the bank (*Morse on Banks and Banking*, 129 *and* 130,) by showing that Mr. Sprigg, its President, was a member of the stock exchange conversant with its customs, and that he was the officer of the bank with whom I. Parker Veazey dealt in these transactions.

There are many cases decided by Courts of the highest respectability which hold directly opposite views as to the negotiability of certificates of stock assigned in blank, and accompanied by a power of attorney such as

the one transcribed in the beginning of this opinion. These cases were pressed upon us with great earnestness in the argument.   The one chiefly relied on by the appellant was *Williams vs. Colonial Bank*, already referred to; whilst that urged most strongly by the appellee was *McNeil vs. The Tenth National Bank*, 46 *N. Y.*, 330.   If this class of cases were applicable to the questions before us, to the extent claimed in the argument, we should follow the English decisions which hold that such a transfer of certificates of stock vests a mere inchoate title, because the same doctrine has heretofore and quite recently been established by this Court.   *Noble vs. Turner, et al.*, 69 *Md.*, 519; *Balto. Retort and Fire Brick Co. vs. Mali*, 65 *Md.*, 97; *Swift vs. Smith*, 65 *Md.*, 435.   The New York cases declaring that such a transfer of itself carries both the equitable and legal title to the shares, are directly in conflict with the Maryland decisions.

The appellant was on either view that may be taken of these securities, on the facts disclosed by the record, and so far considered, entitled to recover unless she had barred her right to do so by ratifying what had been wrongfully done against her.   There can be no ratification where there is no knowledge of the facts.   *Story on Agency*, sec. 239; *Bell, et al. vs. Cunningham*, 3 *Pet.*, 81. To make a ratification effectual it must be shown that there was previous knowledge on the part of the principal of all the material facts and circumstances attending the act to be ratified.   *Adams Express Co. vs. Trego*, 35 *Md.*, 69; *Bloomfield vs. Charter Oak Bank*, 121 *U. S.*, 121. If the principal assents to the act while ignorant of the facts attending it, he may disaffirm it when informed of such facts.   *Copeland vs. Mercantile Ins. Co.*, 6 *Pick.*, 198. In *Hamlin vs. Sears, et al.*, 82 *N. Y.*, 330, it was said that "the general doctrine that any one may by affirmative acts, and even by silence, ratify the acts of another who has assumed to act as agent is not disputed.   It is illus-

trated by many cases to be found in the books, and set forth by all the text writers upon the law of agency. *Story on Agency, sec.* 251 *a;* 2 *Green. Ev., secs.* 66 *and* 67; 2 *Kent Comm.,* 616; *Wilson vs. Tumman,* 6 *Mann. & Gr.,* 236; *Watson vs. Swann,* 11 *C. B.,* (*N. S.,*) 756. But the doctrine properly applies only to cases where one has assumed to act as agent for another, and then a subsequent ratification is equivalent to an original authority. One may wrongfully take the property of another not assuming to act as agent, and sell it in his own name and on his own account, and in such case there is no question of agency, and there is nothing to ratify. The owner may subsequently confirm the sale, but this he cannot do by a simple ratification. His confirmation must rest upon some consideration upholding the confirmation, or upon an estoppel." Now, the bank never was Miss Taliaferro's agent and the acts relied on by it do not amount to a ratification of the pledge or the sale of her securities; still less to a confirmation upheld by or founded on any consideration whatever, for the very obvious reason that it has not been shown that Miss Taliaferro understood what the hypothecation of her property by Veazey meant, or that she was informed, before she acknowledged the powers of attorney or indorsed the bonds, of the circumstances under which the latter had been acquired by the bank and then sold by it. Nor was it shown that she was advised that the bank had taken them as collateral whilst they were in such a condition as to put it upon inquiry; nor that she knew that the sale made by the bank to Wilson, Colston & Co. was, (as far as the record discloses) made, not only without authority, but directly contrary to law, because a private sale. *Balto. Marine Ins. Co. vs. Dalrymple,* 25 *Md.,* 269. On the other hand it was shown that she was induced to believe that "the bank had a perfect right to" sell the securities. She testified that she did not know what hypothecation meant:

that she thought the bonds were entirely gone out of her control and that she had no further interest in them, and that she was told there was something "we were to do that affected other people in reference to them." When asked whether she had ever authorized the hypothecation of the bonds, she replied, "never thought of it; I did'nt know what it was." Her acknowledgment of the power of attorney on August 17th, her receipt of half of the $2094.67 and her endorsement of the securities in September, 1886, at the request of the notary placed the bank in no worse position than it occupied before she did these things. The bank had parted with the securities before these acts were done by her—it had sold them; and as far as we are now advised, had sold them without authority. If it be now compelled to pay her over the proceeds of that sale, it will simply surrender to the rightful owner the money the bank received from the unauthorized conversion of her property, and now still withholds. That money belongs to her and not to the bank. The latter took the risk of lending upon securities which its debtor had no right to pledge, and which were in such a condition as to put it upon inquiry or to charge it with notice of his want of title at the time it received them. If it pays her it will restore to the owner of the property the proceeds of the sale—it will merely give to her that which is hers and will suffer a loss which has fallen upon it by reason of its own carelessness or lack of precaution in dealing with its own customer. If it has lost by trusting Veazey, Miss Taliaferro's acknowledgment of the powers of attorney, her receipt of the money and her subsequent indorsement of the securities *after* the bank sold them, were not acts which produced or contributed to that loss, or prejudiced the bank in the slightest degree. They were not done with any intention of ratifying the wrongful acts of Veazey and the bank; but were done whilst she was in total ignorance

Taliaferro *vs.* First National Bank of Baltimore.

of the material facts of the case and of her right to have redress. She was entitled to sue the bank for the full value of these securities. She received from it part of that which belonged to her. Upon what ground can that act be construed into a waiver of her right to demand the balance? She gave no release, and only took what she was induced to believe was all she could ever get. The mere payment to the rightful owner by the wrong-doer of part of the money realized by the latter from an unauthorized and tortious sale of the property of the former can, upon no legal principle, and should in no Court of justice, be held a ratification or confirmation of the wrong and a surrender of all claim to what may still be unjustly withheld. A doctrine somewhat analogous was applied by the Supreme Court in *Embry, Adm'r vs. Palmer*, 107 *U. S.*, 3, and was reaffirmed quite recently by the same Court in *Reynes vs. Dumont*, 130 *U. S.*, 394.

At the close of the plaintiff's case the Court instructed the jury as follows: "If the jury shall believe all the evidence produced before them by the plaintiff, nevertheless the plaintiff is not entitled to recover in this action, because such evidence shows a ratification upon the part of the plaintiff of the sale of the bonds or notes of the State of Virginia, and offered in evidence, and of the pledging of the same by I. Parker Veazey." For the reasons we have assigned there was error in granting this instruction. What we have said in discussing the evidence must, of course, be understood as applying to the case now presented by the record, and as having no reference whatever to a state of facts at variance with those assumed, under the above instruction, to be true.

This instruction was faulty for another reason: In it the Court told the jury that they were *obliged* to draw certain inferences, if they believed the evidence to be true. It is the province of the jury not only to judge

of the credibility of the testimony, but also to draw inferences from it, which in their judgment are legitimate. They had the undoubted right to infer from Miss Taliaferro's testimony that she was under a total misapprehension of her rights and that she ratified nothing, but simply endeavored to obtain what she was told was all that she had the least chance left of getting. It was for the jury to say whether she had full knowledge of all the facts relating to the pledging of her property, the sale of it by the bank, and the other circumstances relied on to constitute a ratification. *Bannon vs. Warfield,* 42 *Md.,* 32-42.

The rulings of the Court in the third exception excluding evidence of usage and custom on the stock exchange and among bankers and brokers respecting the mode of transferring these Virginia registered consols, and in the sixth exception striking out the testimony of Sterrett McKim, J. Harmanus Fisher, John A. Whitridge and John Redwood on the subject of the same usage and custom, were, as a consequence of the views we have expressed, erroneous. The testimony of Mr. Ruffin in regard to what would be required in Virginia, or what would be required by him in the auditor's office of that State as evidence in connection with the funding of these securities was properly stricken out. The rulings in the second and fifth exceptions were for the reasons already given erroneous. We think it was competent to show that the appellee dealt in these Virginia securities because that was a circumstance from which actual knowledge on its part of the usage and custom in question might be inferred. There was, therefore, error in the exclusion of that evidence in the fourth exception. We find no error in the first exception. It was not a question as to what the rules of the stock exchange were, but a question of usage and custom, and that is not provable by merely showing the existence of such

Taliaferro *vs.* First National Bank of Baltimore.

rules.   It is not material what gave rise to the usage, the existence of the usage is all that need be shown. There was no error committed in rejecting the second prayer in the seventh exception.  ,

   We may add in conclusion that whilst we have treated these securities, in this opinion, in both the aspects presented in the argument, strictly and technically speaking, they are neither promissory notes nor bonds; though they strongly resemble the former, and for all practical purposes may be considered and dealt with as such.   They are certificates of indebtedness respecting the transfer of which a particular usage or custom seems to prevail on the Stock Exchange and amongst bankers and brokers of Baltimore where, they appear to be regarded as bonds.   If no such custom or usage existed they would be subject to and controlled by the legal principles governing the negotiability of commercial paper.   For these reasons we have been induced to consider both views suggested in the argument made before us.

   For the errors indicated the judgment must be reversed and a new trial will be awarded.

*Judgment reversed, and*
*new trial awarded.*

(Decided 12th June, 1889.)


STONE, J. dissented.