Morris, District Judge.
This is a bill filed as a bill of discovery, in which the complainants, citizens of New York, allege that Hancock was their agent to advance money to the packers of canned tomatoes in Harford county, Md., upon the security of the canned goods; that the warehouse receipts for the goods upon which they so loaned money were made out in the name of A. M. Hancock, agent, and afterwards, without authority from them, Hancock pledged the goods to the defendant bank, by indorsing the warehouse receipts to it for loans obtained from the bank for his own use. It is alleged that the officers of the bank knew, or had reason to know, that the complainants were the principals for whom the goods were warehoused in the name of A. M. Hancock, agent, and, in taking the warehouse receipts as security for his own debt, they acquired no title to the goods. The prayer of the bill is for a discovery of the details of a large number of transactions in which goods were so pledged, and for the delivery up of the goods in the bank’s possession, and an account of those sold by its orders, and for other and further relief.
It is objected on behalf of the defendant bank that the bill and testimony do not disclose a case proper for a bill of discovery, for the reason that all the knowledge sought by it the complainants either already had, or could have obtained by the ordinary processes and practice of courts of law. I do not find it necessary to determine this somewhat difficult question; for, independently of discovery as a ground of relief, it does clearly appear from the allegations of the bill and from the testimony that the goods in controversy are goods which had been pledged to the complainants, and which in their behalf the defendant Hancock had placed in warehouses, taking the storage receipts in his name as agent, and that his pledging of them to the bank was a breach of trust, in which the bank participated. Such a breach of trust as is alleged in the bill presents a case of equity jurisdiction very frequently recognized. National Bank v. Insurance Co., 104 U. S. 54; Duncan v. Jaudon, 15 Wall. 165; Warner v. Martin, 11 How. 225; Taliaferro v. Bank, 71 Md. 208, 17 Atl. Rep. 1036; Lowry v. Bank, Taney, 310; Shaw v. Spencer, 100 Mass. 382; Dillon v. Insurance Co., 44 Md. 386. Upon the ground, therefore, that the allegations of the bill disclose that the goods in controversy were deposited in the name of Hancock, agent, and therefore apparently impressed with a trust, and that the dealings between Hancock and the bank amounted to a breach of that trust, I think sufficient appears to give a court of equity jurisdiction, without discussing the sufficiency of the bill as a bill of discovery.
Another preliminary question raised by the bank is the admissibility of certain testimony taken before the master. At the hearing, except *515 tions were filed, and a motion made to exclude so much of the testimony of the defendant Hancock and of Alexander Wiley as was taken upon their re-examination, after having been once called, examined, cross-examined, and dismissed, upon the same subject-matter, and upon the ground that no order of court was first obtained for such re-examination. It is urged by the complainants that the re-examination was by consent of the objecting parties. By reason of difficulties in obtaining the attendance of witnesses, and by reason of the illness and death of the original counsel for the bank, and the illness and death of the original counsel for the complainants, the examination of witnesses before the master was protracted and desultory, and the time for examining witnesses on both sides was frequently enlarged by orders of court upon consent of the parties, and orders were obtained by which testimony was agreed to be admitted as if the orders enlarging the time had previously been obtained; but all these orders and agreements had reference solely to enlarging the time, and not to the admissibility of the testimony, and had no reference to any objections except those growing out of lapse of time. I think the objection urged by the exceptions comes entirely within the salutary rule that the depositions of witnesses previously examined as to the same matters will be suppressed, unless an order of court for cause shown has been first obtained for the re-examination, in which the terms on which the leave is granted and the interrogatories proper to be asked are specially settled. 8 Greenl. Ev. § 336; Trustees, etc., v. Heise, 44 Md. 465; Girault v. Adams, 61 Md. 1. The objections to these portions of the testimony are sustained, and they will not be considered.
The testimony properly before the court shows that Hancock, residing in a village in Harford county, in 1883, and for some years prior thereto, acted as a broker for the sale of canned goods canned by the farmers and packers in that county, and also for the sale of supplies required by the packers. ° In 1882 and 1883, as a broker, he negotiated sales from the' complainants, who were merchants doing business in New York city, to Harford county packers, for cans, solder, and canning tools, for a commision. He also, for a commission, placed for the complainants, in the hands' of certain packers, cans to be filled with tomatoes, at an agreed price, and then shipped to the complainants. He also negotiated some sales of canned goods to the complainants on behalf of the county packers. When the packers who had purchased supplies from complainants were unable to meet the notes given in payment, he appears occasionally to have negotiated discounts for such packers at the defendant bank, becoming indorser on their notes. He was, however, known to the bank officers to be a man of no capital and very little credit. Early in the tomatpacking season of 1883, Hancock suggested to the complainants that as the price of canned tomatoes was very low, and the packers were anxious to hold on to their goods for better prices, the complainants might get the control of the selling of a large amount of these goods packed in Harford county, if they would make liberal advances of money to the packers on pledge of the goods; that the complainants would get interest on their money and a commission of 5 per cent, for selling, of which'com-' *516 mission they were to pay Hancock a share for his services. To this arrangement the complainants consented, and agreed to advance from 70 to 75 cents a dozen on three-pound cans of tomatoes stored in warehouses in their names, with insurance payable to them.
In pursuance of this agreement, the complainants furnished Hancock with large sums of money, which-he deposited in the defendant bank in October, 1883, in the name of A. M. Hancock, agent, he having previously had an account there in the name of A. M. Hancock & Co. These sums so furnished and deposited in October, November, and December, in 1883, amounted to over $93,000, and were loaned out through Hancock’s agency to numerous packers] their notes for the loans to the order of the complainants, together with the warehouse receipts in complainants’ names, being forwarded by Hancock to the complainants. The anticipated rise in the price of canned' tomatoes did not take place, and they came to be worth hardly anything more than the amounts advanced upon them, and for this and other reasons the loans were extended and carried over into the next year. ’ One of the packers becoming insolvent, litigation ensued, in which it was decided that the warehouse receipts issued by the packers for goods stored in their own warehouses, which was the character of many of the receipts taken by complainants as security, were invalid against attaching creditors; and in August, 1884, in order that these goods might be warehoused in such manner that there should be no question about complainants’ title,, all the receipts then in the hands of the complainants, together with the notes secured by them, were sent by complainants to Hancock, in order that he might for them attend to having the goods properly warehoused for their security. These goods were so warehoused in several storage places, but the storage receipts, by Hancock’s direction, were-made out in the name of A. M. Hancock, agent. It was the intention of the complainants at that time that the goods should be rapidly shipped, to them to be sold, or shipped to the persons they should sell to, and that Hancock also should negotiate such sales on their behalf as he could, and ship the goods to the purchasers, the complainants paying him a part of their commission of 5 per cent. ' Although constantly written to and urged, Hancock forwarded the goods very tardily, and in September, 1884, he began borrowing money from the defendant bank upon pledges of these warehouse receipts, which had been made out in his name as agent, and which he indorsed over to the bank. During September, October, November, and December, 1884, he obtained from the bank 15 loans, amounting to about $15,000, pledging as security 10,661 cases, of two dozen cans each, of the tomatoes packed in 1883, and about 5,000 cases of goods packed in the season of 1884.
Without recourse to Hancock’s excluded testimony, but with the light thrown upon the transaction by his first examination, and by other witnesses, and by the bank books, check books, letters, and documentary evidence produced and not excluded, enough appears to show that the complainants held the title to the goods of the pack of 1883, which Hancock pledged to the bank. It is true that in this first examination *517 Hancock does say of these goods that they were put into his hands by the packers, and were warehoused by them in his name as agent, in order that he might sell them to reimburse himself for money which he had advanced them; but from his own testimony, and bank book and the documents and letters he produces, it appears that all the advances originally made by him to these'packers of the goods of 1883 had been repaid to him out of the loans subsequently made to them by the complainants; and although he attempts to confuse the matter by speaking of his advances to these packers, and of their orders to him to sell their goods to pay the advances, it is perfectly obvious that the advances were the loans he had made for the complainants with complainants’ money. Of the goods of the pack of 1883, all have been traced, and the testimony leaves no doubt that they were portions of the goods pledged to complainants, and héld by them as security for their loans to the packers. These loans, with interest, storage, insurance, and commission, in most cases quite equaled, if they did not exceed, the value of the goods, and in October, 1884, the packers had no longer any beneficial interest in them.
As to the goods of the pack of 1884, with regard to some of them, it appears that Hancock, from the sale of other goods pledged to complainants, had money of theirs in his hands, which he should have reported and paid over, but instead he used it in making advances to packers on the pack of 1884, and in purchasing goods of that year. These goods he also warehoused in the name of A. M. Hancock, agent, and they are the goods of 1884 pledged to the bank. Together with these, however, there were some goods of the pack of 1884 which Hancock had taken as security for sales he had made for complainants of cans and solder.
As to the goods of the pack of 1883, the actual fact being that they were the goods of the complainants, and that Hancock had no title to them, and that the warehouse receipts were in his name as agent, unless there is some provision of the Maryland factors’ act or of the Maryland warehouse act, or unless the complainants are in some way estopped, it is well-settled law that Hancock, although he had authority to sell, could not, without complainants’ authority, pledge the goods, and that the bank, independently of all the other sources of knowledge, from the word “agent” on the face of the warehouse receipts, had notice that Hancock was not the actual owner, and that, he was prima facie doing an unauthorized and unlawful act in pledging them, and that the bank in loaning money on them assumed the burden of ascertaining the actual fact of ownership and Hancock’s authority to pledge. The cases already cited are authority for this rule of law, and many others might be cited.
Beyond the significant fact that the warehouse receipt itself imported that Hancock was not the actual owner, there was much within the knowledge of the officers of the bank with regard to the large amount of money of the complainants passing through their bank in Hancock’s account, as agent, and which they knew that Hancock was advancing for complainants on the security of canned goods placed in warehouses in the season of 1883, which should have put them upon inquiry as to *518 the'actual ownership of the goods. It is true that when the account was opened in November, 1883, the officers of the bank asked Hancock for whom he was agent, and he replied, “For my wife and children;” but they could not escape knowing the nature of the transactions for which the account was used, and as to the ownership of these goods taken by them it is not contended that they ever made any inquiry whatever. That the goods pledged to the complainants, stored in the' different warehouses, should be warehoused in the name of Hancock, agent, under all the circumstances of the business, was natural. It enabled Hancock to attend to shipping them in such lots as the complainants might make sales of, and as he might be directed by them. The fact that Hancock had the authority from complainants to sell and deliver such of them as he could find purchasers for at satisfactory prices does not help the bank’s case at all, for an authority to sell does not include a power to pledge. Allen v. Bank, 120 U. S. 32, 7 Sup. Ct. Rep. 460, and cases there cited.
Coming now to the goods of the pack of 1884, I think most of them stand upon a different footing. The title to at least a considerable quantity of these goods was never in the complainants. • All that can be said in their behalf is that, as Hancock had converted complainants’ money to his own use, and had misapplied it in obtaining these goods of the pack of 1884, instead of paying it over to them, that they might have an equitable lien on the goods to the extent that their money was used in paying for them. But, with some exceptions, Hancock never considered these goods theirs. He did not obtain these goods for them., but for himself. In warehousing them in his name as agent, he may have intended to protect them from other creditors if occasion required; but he did not intend to give complainants a title to them, and never told them anything about them, and they knew nothing about them. If the officers of the bank had gone .to the complainants, and asked if these goods were theirs, they would have been obliged to answer that to their knowledge they had no goods of the pack of 1884 warehoused in Harford county.
The* money of the complainants has not been directly and distinctly traced to the payment for these goods, and I do not find the misappropriation of complainants’ money, in purchasing, brought home to the officers of the bank, so as to affect them with knowledge of it. It seems not at all improbable that some of the loans from the bank went in part to pay for these goods.
On behalf of the bank, it is urged that both by the Maryland factors’ act, (Code, art. 2,) and the Maryland act with regard to storage receipts, (Code, art. 14,) the common-law limitations upon the right of one intrusted with goods to pledge them have been so altered as to protect the bank in its transactions with Hancock. The Maryland factors’ act provides that any one intrusted with bills of lading, storekeepers’ certificates, orders for the delivery of goods, or similar documents showing possession, shall be deemed the true owner of the goods described therein, and may sell or pledge the same to any person: provided, that person *519 shall not have notice, by such documents or otherwise, that the person so intrusted is not the actual and bona fide owner. In the present case, however, it is plain that the bank, from the word “agent” appearing on the face of the warehouse receipt, had notice that Hancock was not the actual and bona fide owner.
By the Maryland act with regard to storage receipts, they are declared to be negotiable instruments in the same manner as bills of lading and promissory notes; but it still remains the law with regard to storage receipts, as well as with regard to negotiable 'instruments, that the pledgee takes them at his peril, if there is anything appearing on the face of the instrument which affects the holder’s right to pledge it. The holder of a promissory note, made payable to him as trustee, executor, attorney, or agent, has not prima facie the right to pledge it. The fiduciary character of the holder being expressed on the face of the instrument, and giving notice that the holder is not the true owner, there is nothing in any of the Maryland acts which relieves the pledgee from' ascertaining the actual authority of the holder to pledge. Allen v. Bank, 120 U. S. 20, 7 Sup. Ct. Rep. 460.
In my judgment, the complainants have established their right to a decree against the bank for the amount realized by it from the sales of 10,661 cases of canned tomatoes of the pack of 1883, pledged to it by Hancock.
It is urged that there was laches on the part of the complainants after they learned that their goods had been pledged and were being sold by direction of the bank, in delaying to notify the bank of their claim, and, in consequence of that delay, the bank paid to Hancock a considerable balance in cash which remained after satisfying the bank’s loans, and which, if timely notice had been given, they could have retained. From a letter from complainants to Hancock, dated November, 1885, they appear to have heard that goods were being sold by a commission merchant at Havre de Grace named Seneca, by direction of the bank, for money loaned, which they suspected might be their goods, and they asked Hancock for an explanation of it. What his explanation was I do not find, but, as they did not notify the bank of their claim until four months afterwards, there would appear to have been a remissness on their part; but as there were pledged to the bank by Hancock, besides the goods of 1883, which I have held to be the complainants’, about 5,000 cases of the goods of 1884, which Hancock obtained in the manner hereinbefore mentioned, and as to some of which the testimony indicates that they were also held as security for debts due to complainants for goods sold the packers in 1884, and as it does not appear from which of these lots of goods the balance paid over was derived, I do not find that there is any presumption that the money paid over was derived from complainants’ goods, rather than from the goods which were not complainants.
Decree in favor of complainants for the amount realized from the sales of the goods of 1883 sold by the bank, with interest from date of filing bill, and costs.