PEOPLE'S BANKING COMPANY *v.* FIDELITY & DEPOSIT COMPANY.

FRANK R. CROWTHER ET AL. *v.* FIDELITY & DEPOSIT COMPANY.

[Nos. 61, 63, October Term, 1933.]

658

*Decided January 17th, 1934.*

The causes were argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Daniel W. Doub* and *W. Clinton McSherry*, with whom was *Elias B. Hartle* on the brief, for the appellants.

*Washington Bowie, Jr.,* and *Walter L. Clark,* with whom were *William D. Macmillan* and *J. Stuart Galloway* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On June 29th, 1931, the stockholders of the People's Banking Company of Smithsburg, Maryland, herein called "the Bank," at a special meeting, resolved (1) in consideration of the agreement of the Central Trust Company of Maryland, herein called the "Trust Company," to assume all liability to the depositors of the Bank, (a) to sell all stocks, bonds, and securities held by it at the market price thereof, (b) to sell and transfer to the Central Trust Company, "without recourse," all its notes, bills receivable, mortgages and judgments at the face value thereof, except certain obligations specifically described aggregating $72,690.48, (c) to sell to said Trust Company its bank building and fixtures at $15,000, and other real estate valued at $6,250; (2) to borrow from the Central Trust Company $40,000, pledging for the repayment of the loan all assets of the Bank not "taken over" by the Trust Company, said sum to be used to acquire 1,333 shares of the capital stock of the Central Trust Company to be exchanged for stock of the Bank at the ratio of one share of the Trust Company stock for three shares of the Bank stock; and (3) to disburse all collections made by a liquidating committee in excess of $40,000 *pro rata* to the stockholders of the Bank.

The several transactions contemplated by that resolution, except the disbursement of the anticipated excess of collections over the $40,000 loan, appear to have been carried out, but on October 29th, 1931, F. R. Crowther and others, stockholders and depositors of the Bank, filed the bill of complaint in this case against George W. Page, receiver of the Trust Company, which had closed its doors on September 3rd, 1931, in which they asked the court (1) to nullify and set aside (a) the "consolidation merger or acquirement" to the Bank by the Trust Company, and (b) the contract of the Bank with the Trust Company; (2) to compel the restoration to

the Bank of all property transferred to the Trust Company under the resolution; (3) to appoint a receiver for the Bank; and (4) to require an account of property and assets acquired by the Trust Company from the Bank "subsequently disposed of".

On February 13th, 1932, the plaintiffs in that bill filed in the case a petition alleging that the Trust Company had improperly assigned certain mortgages which it had acquired from the Bank to the Fidelity & Deposit Company of Maryland, herein called the "Fidelity Company," to indemnify it against loss on certain depositary bonds which it had executed as surety for the Trust Company. The basis of the attack on the transaction by which the Trust Company acquired the assets of the Bank was that it had been induced by false and fraudulent representations by officials of the Trust Company to officers, directors and stockholders of the Bank as to the solvency and assets of the Trust Company. The basis of the attack on the assignments of mortgages acquired from the Bank by the Trust Company, and by it assigned to the Fidelity Company, was that there was no valuable consideration for the assignments, that they were made at a time when to the knowledge of the Fidelity Company the Trust Company was "hopelessly and irretrievably insolvent," and that it knew before said assignments that they "were" (would be) illegal and void; that said assignments were null and void; and plaintiffs therefore prayed that the Fidelity Company be made a party defendant, and required to answer the bill, and an order granting that relief was passed. The several defendants answered in due course, other interlocutory proceedings were had, testimony was taken, and on December 29th, 1932, the court filed an opinion in which it announced that the evidence did not justify the conclusion that the transaction between the Bank and the Trust Company was induced by fraud, but that it did show that it was the result of a mistake common to both parties, as to the "financial strength" of the Trust Company, and for that reason would be set aside and the property and assets of the bank in the hands of the receiver returned to it,

and further that the evidence was not sufficient to charge the Fidelity Company with knowledge, at the time the mortgages were assigned to it, that the Trust Company was insolvent when they were assigned, that the assignments were based upon a sufficient consideration, and it would refuse to set them aside. On March 11th, 1933, a decree carrying those conclusions into effect was passed.

On May 4th, 1933, the Fidelity Company filed a petition in which it alleged that the mortgages assigned to it by the Trust Company had been assigned under an agreement under which the Trust Company had agreed to assign all the mortgages described in a schedule annexed thereto, but that in fact four of the mortgages listed in the schedule were not assigned when the other mortgages were assigned, because of some adjustments to be made by the Trust Company in respect to them, but that, before said adjustments were completed, the Trust Company passed into the hands of the state bank commissioner; that by the decree the receiver of the Trust Company was directed to reassign and transfer to the Bank these four mortgages; that that action was inadvertent because it was "the manifest intention of the court" to award to the petitioner all the mortgages transferred by the Bank to the Trust Company which it had agreed to assign to the Fidelity Company, and it prayed the rescission of so much of the decree as awarded those four mortgages to the Bank. The plaintiffs answered that petition, it was heard on petition and answer, and on May 8th, 1933, dismissed.

From so much of the decree of March 11th, 1933, as refused to direct the reassignment and delivery to the Bank of the mortgages assigned by the Trust Company to the Fidelity Company, the Bank (appellant in No. 61) and F. R. Crowther and others (appellants in No. 63) appealed, and from the order of May 8th, 1933, the Fidelity Company (appellant in No. 62) appealed. These three appeals are in one record. The appeals in Nos. 61 and 63 are from the same part of the same decree, present the same question, and will be considered together. The appeal in No. 62 presents a different question, and will be considered separately. See *post,* 693.

The question submitted in Nos. 61 and 63 is whether the Fidelity Company acquired the mortgages assigned to it by the Trust Company in good faith, for a valuable consideration, and without notice or knowledge of any infirmity in the title of the assignor.

The plaintiffs, in the original bill of complaint, alleged that the contract under which assets of the Bank were transferred to the Trust Company was induced by the fraud of officials of the Trust Company. The chancellor found no sufficient evidence of the fraud alleged, but did find that the contract resulted from a mistake common to both parties to it as to its subject-matter, and for that reason annulled it and set it aside. There was no appeal from so much of the decree as decided that issue, and it must therefore in this case be accepted as finally adjudicated. And while, since the decree itself does not state that it was based upon a finding of mistake rather than fraud, it may be supported if the evidence showed either that the contract resulted from mistake or was induced by fraud, and it is unnecessary to consider in this inquiry whether it was the result of the one or the other, for under the principles stated in the *Restatement of the Law of Contracts, A. L. I.,* secs. 49, 71, 456, 501, 502, 475, 476; *Williston on Contracts,* secs. 1538, *et seq.,* 1594; 6 *R. C. L.* 621; *Hecht v. Batcheller,* 147 Mass. 335, 17 N. E. 651; *Wheat v. Cross,* 31 Md. 104, at most it was upon the facts of this case voidable and not void. The parties both intended to execute that identical contract, the property transferred under it was the identical property intended to be transferred, and the supposed mistake related, not to the nature or identity of the property transferred, but to its quality and value (*Wheat v. Cross, supra, Hecht v. Batcheller, supra*), and under it title to the mortgages involved in this proceeding undoubtedly passed to the Trust Company. Whether such a mistake, under the rule stated in *Wheat v. Cross, supra, Hecht v. Batcheller, supra,* would be ground for avoiding the contract at all, need not be considered, for that question, so far as this case is concerned, has been finally put at rest by the decree, for, whether induced

by fraud, or, as the decree determined, by mistake, the result was the same. In such a case a purchaser for value, who acted in good faith, and without notice or knowledge of any infirmity in the title of his vendor, acquired an indefeasible title (*Williston on Sales*, secs. 348, 650, 656; *Nat. Bank of Bristol v. Balto. & O. R. Co.*, 99 Md. 661, 59 A. 134), for, while the general rule is that a vendee acquires no better title than his vendor, it is subject to an exception, quite as well established as the rule itself, that, where the true owner puts it in the power of another to deal with property as though it were his own, and that person transfers it to one who purchases it in good faith, for value, and without notice or knowledge of any infirmity in the title of his vendor, the true owner will be estopped from asserting his title against such purchaser. 55 *C. J.* 622, *et seq.; Lemp Brewing Co. v. Mantz,* 120 Md. 181, 87 A. 817; *Hopper v. Callahan,* 78 Md. 534, 28 A. 385; *Levi v. Booth,* 58 Md. 305; *Hall v. Hinks,* 21 Md. 406. The essential elements of any definition of an "innocent purchaser" are: (a) That he must have given value for the property; (b) that he must have dealt in good faith with respect to the purchase; and (c) without notice or knowledge of any infirmity in the title of his vendor. Each of those elements is in sharp issue in this case both as to the facts and the law applicable to the facts, and the evidence relating to them is not only voluminous but interwoven with other evidence pertinent only to issues not involved in the appeal. To analyze that evidence in detail would, because of its volume, tend rather to obscure than expose its meaning and effect, and for that reason we will state only our conclusions in respect to it.

Consideration. The Central Trust Company, as a depositary of the State of Maryland, was required to execute to the State depositary bonds to protect state. funds deposited with it. In compliance with that requirement, it executed three bonds with the Fidelity Company as surety, one dated on July 1st, 1923, in the penalty of $75,000; one dated December 23rd, 1929, in the penalty of $25,000, and one dated February 18th, 1923, in the penalty of $5,000; on

January 6th, 1931, a bond in the penalty of $100,000 with the Fidelity & Casualty Company as surety, and two bonds with the United States Casualty Company as surety, one of which was dated June 30th, 1930, in the penalty of $20,000, and the other dated November 7th, 1930, in the penalty of $100,000. The condition of each of these several bonds was that the Trust Company would safely keep and have forth-coming when required all money deposited with it by the State of Maryland, and in all respects duly account for such deposits according to law.

At the time the bond dated January 6th, 1931, was writ-ten, business and economic conditions were a source of seri-ous concern to persons engaged in the bonding business, and surety companies were unwilling to assume additional obli-gations. Consequently, when application for that bond was made, it was accepted only upon the condition that the Trust Company pledge collateral to secure the Fidelity & Casualty Company against loss. As the law then stood, there was doubt as to the right of the Trust Company to use its assets for such a purpose, so that, instead of pledging its assets directly, it pretended to sell them to one of its employees, taking her note for the assumed purchase price, and she appears to have turned them over to Emory L. Coblentz, president of the Trust Company, who then hypothecated them with the Fidelity & Casualty Company to secure it against loss as surety on the depositary bond which it had executed for the Trust Company.

These six bonds were for no definite term, but were de-scribed in the evidence as "continuing bonds," that is to say, they continued in force without formal renewal from year to year indefinitely, but the state treasurer nevertheless de-manded that at the anniversary date of each bond the bond-ing company appearing as surety thereon issue a renewal certificate. Accordingly, on May 28th, 1931, he addressed to the Trust Company a letter in which he said:

"According to our records, you have in force the following depositary bonds to secure deposits of State funds by the Treasurer.

| Surety | Amount | Expiration |
|---|---|---|
| Maryland Casualty Co.......$ | 20,000.00 | 6/20/31 |
| United States Cas. Co........ | 20,000.00 | 6/20/31 |
| United States Cas. Co........ | 100,000.00 | 11/ 7/31 |
| Fidelity & Deposit Co........ | 75,000.00 | 7/ 1/31 |
| Fidelity & Deposit Co........ | 25,000.00 | 12/23/31 |
| Fidelity & Deposit Co........ | 5,000.00 | 2/18/32 |
| Fidelity & Cas. Co.......... | 100,000.00 | 1/ 6/32 |
| | $345,000.00 | |

"Our present balance with you is $330,661.03 and it will be necessary for the above bond which expires June 20th and 30th to be renewed in full part for another year. We would like to have renewal in hand a few days before the expiration, and it is absolutely necessary that it reach us not later than that date. Kindly get in touch with the surety company, and advise us your action in the matter."

At some time in 1931, probably subsequent to that letter, the Fidelity & Deposit Company of Maryland learned that the United States Casualty Company was about to retire from the bonds on which it appeared as surety. Paul L. Wellner, vice-president of the company in charge of its depositary bond business, in describing business and economic conditions at that time, said: "There had been up to that time a great number of bank failures throughout the country. The depositing public was very nervous. We not only had to underwrite banks, but we had to do the almost impossible thing, to underwrite the state of public mind. At that time the president of the Central Trust Company was receiving what we thought was unfavorable notoriety by reason of his having been named in association with certain interests in Washington that were not calculated to instill confidence in the minds of depositors. There was one company, the United States Casualty Company, which seemed upon the point of cancelling its suretyship. I learned this not as a result of correspondence, but as the result of word of mouth, that the United States Casualty Company was going to re-

turn its suretyship on behalf of the Central Trust Company. We thought that might be harmful to the bank, might be harmful to us, because if the United States Casualty Company served cancellation notices in connection with its bonds, that would become a matter of public record that would create apprehension in the minds of the depositing public and create a run on the bank, which was something we wanted to avoid. As a result, I volunteered to go to New York and confer with the New York Casualty Company. I first conferred with the Fidelity & Casualty Company, and we later called Mr. Nathan Moberly, manager of the bond department of the United States Casualty Company, and convinced them that the thing to do was not to cancel the bonds, but to keep its bonds in force and take collateral. There was no question in our minds at that time concerning the solvency of the bank, but we were fearful that the unfavorable notoriety attached to Mr. Coblentz' name in the newspapers might create a run, and we know that runs ruin the best of banks."

Negotiations followed between the Fidelity Company, on its own behalf and as representing the United States Casualty Company and the Fidelity & Casualty Company, and the Trust Company, which culminated in an agreement under which the Trust Company deposited with the Fidelity Company, as collateral to secure it and the two other bonding companies against loss on the depositary bonds described above, certain securities, which included mortgages which had been assigned to the Trust Company by the Bank aggregating in value $117,300, hereinafter called the Smithsburg mortgages. That agreement, which lay partly in correspondence and partly in parol, was executed prior to August 10th, 1931, on which date a written agreement fixing the terms upon which the collateral deposited was held was executed. The securities listed were pledged under the authority of chapter 429 of the Acts of 1931 (section 1), which amended article 11, section 23, which enumerates the powers of banks and trust companies, by adding an additional sub-section, which provided:

"Seventh. To deposit securities for the purpose of secur-

668

ing deposits of the United States Government and its agencies, and the State of Maryland and counties, cities, towns and other political sub-divisions of the State of Maryland, or to secure the surety or sureties on bonds furnished to secure such deposits."

While active negotiations resulting in the execution of the collateral agreement apparently were not taken up prior to the summer of 1931, Wellner had written Coblentz in the fall of 1930 that he thought the Fidelity Company had "too heavy a line of suretyship" on his bank, and intimated that he (Coblentz) would have to take steps to see that it was relieved of "that bond". In December, 1930, or January, 1931, the United States Casualty Company had informed its Baltimore agent that as a matter of "common policy" it desired to retire from the Trust Company bonds, but at the agent's solicitation it did not retire from them, and at the time of the negotiations which resulted in the deposit of collateral to protect the sureties it remained as surety on the bonds it had executed. The certificate of the Fidelity Company continuing the $75,000 bond of that company was dated as of June 26th, 1931, and actually issued to the state treasurer on July 16th, 1931. But George L. Radcliffe, first vice-president of the Fidelity Company, in a statement accepted as evidence, said that prior to that time that company had declined to renew the $75,000 bond on its anniversary date, July 1st, 1931, and that the continuation certificate had only been issued after Coblentz, acting for the Trust Company, had agreed to deposit with the Fidelity Company collateral to protect it and the other two bonding companies against loss on that and the other depositary bonds described above. Later, in July, 1931, probably on the 23rd, Wellner, acting for the Fidelity Company, met at a conference in New York representatives of the United States Casualty Company and the Fidelity & Casualty Company, and at that conference it was agreed that the Fidelity Company should act as agent for the other two companies in receiving the collateral to be pledged by the Trust Company.

When the state treasurer notified the Trust Company on

May 28th, 1931, that continuation certificates must be issued on or before the anniversary date of the depositary bonds securing state deposits, the State had on deposit with the Trust Company $330,661.03.

Without passing at this time on its solvency or insolvency, it is clear that at that time the Trust Company was in a precarious condition, and, while it cannot be definitely said that, if demand had been made then or at any time before the certificate continuing the $75,000 policy, dated July 1st, 1923, was issued, it could not or would not on such demand have repaid to the State the state funds deposited with it, it may definitely be said that not only was its ability to make any such payment extremely doubtful, but that, if such a payment had been made, it would probably have prevented the continued operation of the Trust Company.

In January, 1931, apparently to bolster its cash position, one of its directors, Thomas B. Hayward, borrowed $90,000 in order to lend that amount to the Trust Company. On July 11th, 1931, Coblentz, writing to Radcliffe, stated that "all the quickly marketable securities" of the Trust Company had been used for "direct borrowing purposes." As early as July, 1930, when notified by the Cumberland Steel Company that it proposed to withdraw $300,000 over a period of approximately three months, it found it inconvenient to meet that demand, but sought and obtained an extension of two months, under which the last installment of $50,000 was to be subject to withdrawal on December 15th, 1930. But, when the Steel Company on December 26th, 1930, notified the Trust Company that it would withdraw that amount on January 1st, 1931, it was met with a request to postpone the withdrawal until February 1st, 1931. Following that, there was a constantly increasing pressure from the Steel Company to withdraw its funds from the Trust Company, with a corresponding effort on the part of the Trust Company to delay and hinder such withdrawal, which culminated in the refusal of the Trust Company to pay a check drawn on it by the Steel Company, dated July 7th, for $93,068.49, although it had that amount to its credit with the Trust Company.

On July 7th, 1931, the Steel Company wrote the Trust Company notifying it of the proposed withdrawal. On the same day the Trust Company wrote the Steel Company that it might withdraw $81,000 over a period of four months in one installment of $6,000 and three of $25,000, and on the following day telegraphed that it would not honor the Steel Company's check for $93,068.49, which on July 9th, 1931, was protested for nonpayment. The Trust Company alleged as a reason for its refusal to pay the check that it was against a time deposit, but on May 26th, 1931, the Steel Company had directed the Trust Company to put the balance of its account on "a straight checking basis, so that it will be subject to check at any time."

While, because of the manner in which the evidence relating to the financial condition of the Trust Company in June, 1931, and immediately before and after that month, appears in the record, it is impossible to fix with certainty the aggregate amount of its assets and the extent of its liabilities, it may be said that, measured by any test of solvency known to the law, the Trust Company was not solvent at that time. A "Condensed Statement" of the Trust Company dated June 30th, 1931, and published by it, showed that in its resources were included "Loans and Discounts" $13,541,072.84, "Mortgages and Judgments" $1,511,235.27, "Bonds and Stocks" $2,527,893.89, and that at that time it was liable on demand deposits for $2,568,054.71, on time deposits for $11,529,-617.13, on demand loans payable for $318,000, on time loans payable for $356,000, and on rediscounts and acceptances for $251,748.10. While the statement was probably correct in so far as it described the liabilities of the company, it was misleading and inaccurate in its description of its resources, and the stated figures had no substantial relation to the actual value of much of the property included in the categories given, as fixed by any available market at that time. In its "Loans and Discounts" alone there was an indicated loss which not only consumed its capital and surplus, but left a deficit of several million dollars, and much of that loss was

of such a character that no change of conditions remotely probable would have repaired it.

In determining whether upon those facts the forbearance of the bonding companies to apply for permission to retire from the bonds which they had executed to the State to secure its deposits with the Trust Company was a valuable consideration, consideration must be given to the following factors: (1) The nature and extent of the obligations, liabilities and rights of the bonding companies under the bonds; (2) the nature and extent of the hazard involved in their forbearance in addition to that which they had already assumed; and (3) the benefit to the Trust Company resulting from such forbearance.

Article 90, section 8 of the Code, provides: "When the surety or sureties on the bond of any bank used as a depository for the funds of the State by the state treasurer shall notify the governor and the state treasurer of their or its desire to be relieved from further liability as such surety, the state treasurer may, in his discretion, immediately demand of such bank a new bond with good and sufficient surety or sureties; if such bank shall not within thirty days after service of notice upon it by the state treasurer furnish new bond with good and sufficient surety or sureties to be approved by the governor, it shall be the duty of the state treasurer to immediately withdraw all moneys of the State deposited with the said bank. Upon the approval and acceptance by the governor of the above mentioned new bond, and upon the payment of all moneys then due by such bank to the State, petitioning surety or sureties shall be released from any further liability on the bond executed by him, it or them."

It is conceded that the bonds under consideration were "continuing" bonds; that is, they continued in force until terminated by some act of the parties. The statute just quoted refers to all bonds, those for a definite term as well as to those for an indefinite term, so that, when it provides that the state treasurer "may, in his discretion" demand of the depositary a new bond, that authority must be considered

672

in connection with both classes of bonds. When applied to bonds for a fixed term, there would be force in the contention that the surety had no absolute right to be relieved of a definite contract, all the terms of which were fixed, but when applied to a bond for an indefinite term, it rests upon a more unstable foundation. The text of the statute, if applied literally to such a bond, would mean that the surety was bound at the discretion of the obligee to guarantee indefinitely the return of funds deposited with the depositary, whether the depositary continued to pay for the service or not, and without any regard to change in the financial condition of the depositary. Such a construction, considered in connection with the Constitution, art. 6, sec. 3, would seem to be unreasonable, since the sole purpose of the statute and the Constitution is to protect the State against loss through the default of its depositaries, and not to control the relations between the depositaries and their sureties. So that, when the application of a surety to be relieved from further liability as surety on a depositary bond to the State involves no risk of loss to the State, there is no sound reason why that relief should not be considered a matter of right rather than of absolute discretion. And the statute appears to contemplate that, for it does not authorize the treasurer to release the surety from any liability on the old bond merely upon its application for such relief, but upon such application to demand that the depositary substitute a new bond, with good and sufficient sureties, for the old bond, and upon its failure to furnish such a bond to withdraw all moneys deposited with the depositary. Under those provisions the original bond remains in full force and effect until the depositary substitutes a new bond with satisfactory and sufficient surety for the original bond, and until that is done the sureties on the original bond remain liable for any breach in the condition thereof, whether such breach occurs after or before the sureties have applied to be relieved from further obligation on the bond.

There may be cases in which the treasurer might not deem it wise to permit a depositary to continue to hold state funds

with or without a new bond, but in such cases it would be within his power and might become his imperative duty to at once demand the return of such funds, and thus fix the liability of the parties to the original bond. So that the purpose of the statute would seem to be, not to require him to demand such deposits, but to permit him in his discretion to demand a new bond in lieu of such action, and, in the event of the failure of the depositary to furnish such a new bond on demand, to withdraw any state funds which may be in its custody. But the surety on a continuing bond would seem entitled as of right to demand that the treasurer either demand a new bond or that he demand the return of the funds in the custody of the depositary protected by the old bond. While the bonds recite that the Trust Company had been designated by the Governor as a state depositary, there is nothing in the Constitution or laws of the State which require it to continue such a designate as a state depositary for any definite period, nor to deposit with it any definite sum of money, but, on the contrary, the State may not only decline to deposit additional funds with it, but may at any time withdraw funds already deposited. So that the status of the Trust Company as a state depositary was indefinite and continuing, just as the liability of the bonding companies as sureties on bonds guaranteeing such deposits was indefinite and continuing. Under such circumstances, the right of a surety on such a bond to be relieved from further liability thereon seems to be recognized. 18 *C. J. "Depositaries,"* sec. 63; *Manitowoc County v. Truman,* 91 Wis. 1, 64 N. W. 307, 310; *Snattinger v. Topeka,* 80 Kan. 341, 102 P. 508. In *Manitowoc County v. Truman, supra,* it is said: "As indicated, the duration of the contract between the county and the banking company was unfixed, and was liable to be terminated by order of the county board at any time. So, it would seem, the sureties were at liberty to terminate the agreement, so far as they were concerned, at any time, on giving notice. *Reilly v. Dodge,* 131 N. Y. 153, 29 N. E. 1011; *Emory v. Baltz,* 94 N. Y. 408; *Offord v. Davies*

(12 C. B. [N. S.] 748), 104 E. C. L. 748; *Hyland v. Habich,*
150 Mass. 112, 22 N. E. 765. So that the "discretion" re-
cited in the statute would seem to refer to a discretion either
to demand the repayment of state funds deposited with the
depositary, or to demand the substitution of a new bond for
the original bond, and not to an uncontrolled discretion to
compel a surety on a continuing depositary bond to remain
on it indefinitely and under all circumstances. The sureties
on the depositary bonds were liable for any breach in the
conditions thereof until the expiration of a reasonable time
(which under the statute would be not less than thirty days)
after notice that they desired to be relieved from further
liability as sureties thereon, and upon such application they
were entitled to have the treasurer either demand the state
funds on deposit with the Trust Company or require it to
furnish a new bond.

The condition of the several depositary bonds executed by
the Fidelity Company was that the Trust Company should
"at all times, safely keep and have forthcoming when re-
quired" all deposits of the State of Maryland, "and duly
account for such deposits according to law." Prior to the
negotiations in the summer of 1931, which culminated in
the assignment of the Smithsburg mortgages to the Fidelity
Company, there had been no breach of the condition, because
prior to that time it does not appear that the Trust Company
failed to repay upon demand funds which it held as a state
depositary. Nor can it be certainly assumed that, if the
Fidelity Company and the other bonding companies had in-
sisted on being relieved from their obligations under the
surety bonds in June or July, 1931, that the Trust Company
could not have furnished new bonds, or have repaid to the
State moneys deposited with it by the State. If it had fur-
nished new bonds, the sureties on the original bond would not
have been liable for the safe-keeping and repayment of
moneys on deposit after the new bonds were executed, ac-
cepted, and approved, unless demand for the repayment of
such funds had been made and refused before the acceptance
of the new bond, for, while the statute provides for such

release upon the execution of new bonds "and" the payment of moneys "then due by such bank to the State," the "payment" must refer to payments demanded prior to the acceptance and approval of the new bonds. The sureties were powerless to compel the State to demand repayment, or to compel the Trust Company to make such repayment until the State did demand it. So that, unless "and" was intended to mean "or," or unless "payment" referred to past defaults, the statute would be meaningless. And in agreeing to continue the bonds the sureties did incur the risk of a liability which they might have escaped if they had insisted upon retiring as sureties thereon.

On the other hand, the officers of the Trust Company feared that, if the bonding companies insisted upon retiring as sureties on the depositary bonds, their action would precipitate a crisis which they were anxious to avoid. Either because they believed that the company could not procure new bonds satisfactory to the State, or that it would not be able upon demand to repay to the State the state funds which had been deposited with it, or because they felt that the mere request of the bonding companies for that relief would be sufficient to accelerate the collapse of an already tottering structure, it is certain that they considered it a matter of the most urgent necessity that the bonding companies should not apply to be relieved as sureties on the depositary bonds. The wisdom, the propriety, or the honesty of their policy in attempting to keep the Trust Company operating as a going concern, notwithstanding its dangerous and unsafe condition, is not in issue, and, in view of the pendency of other litigation affecting the company, comment as to them would be improper. But it is sufficient to say that the act of the bonding companies in continuing as sureties on the bonds was of very great importance to the continued operation of the Trust Company and beneficial in promoting a policy which it had deliberately adopted and pursued.

Consideration, in the law of contract, is usually spoken of as anything of benefit to the promisor and of detriment to the promisee, *Brantly on Contracts,* ch. 2. And in the *Restate-*

*ment of Contracts, A. L. I.,* sec. 75, it is defined as follows: "(1) Consideration for a promise is (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise." *Id.,* sec. 78, states: "A promise is insufficient consideration if the promisor knows or has reason to know at the time of making the promise that it can be performed by some act or forbearance which would be insufficient consideration for a unilateral contract." In *Hercules Powder Co. v. Harry T. Campbell Sons Co.,* 156 Md. 365, 144 A. 510, 517, Judge Parke for the court states: "The undertaking or doing of anything beyond what one is already bound to do, though of the same kind and in the same transaction, is a good consideration. *Williston's Wald's Pollock on Contracts* (3rd Ed.), 203, 204."

In the application of those definitions and principles, it is generally held that a promise to do what one is required by law or contract to do is not a valuable consideration. 13 *C. J. "Contracts,"* secs. 207, 209. But in *Linz v. Schuck,* 106 Md. 220, 67 A. 286, where a contractor had agreed to build a house for $1,500, but because of unforeseen difficulties was about to abandon his contract, it was held that he could recover from the owner on his promise to pay for extra work required to complete performance of the original contract, and, while the rule stated in that case followed *King v. Duluth etc. Ry. Co.,* 61 Minn. 487; 63 N. W. 1105, which has been widely criticized, it was deliberately adopted, has some support in the cases (13 *C. J.* 354, 355; note 14 *Ann. Cas.* 495), and is the rule in force in this state. Certainly if in that case the agreement of the promisee to perform what he had already agreed to do was sufficient consideration for a promise to pay additional compensation therefor, a promise to do what one is not obliged either by law or contract to do may constitute a valuable consideration.

Applying the principles stated in *Linz v. Schuck, supra,* to the facts of this case, the agreement under which the Trust Company assigned the Smithsburg mortgages to the

Fidelity Company to secure it and other bonding companies against loss arising from their liability on state depositary bonds executed by the Trust Company, resting as it did upon the forbearance of such bonding companies to apply for relief from further liability as sureties on such bonds, was based upon a valuable consideration. In *Linz v. Schuck,* what the promisor did was to buy the specific performance of a contract, which the promisee had already agreed to perform; in this case the consideration for the assignment of the mortgages was the continuation of a service which the promisee was not prevented by any legal or contractual obligation from terminating. Appellants contend, however, that, when the mortgages were assigned, the bonding companies were already under an obligation to continue the bonds, and any promise by the Fidelity Company to continue them was a past consideration. That contention, however, involves several fallacies: First, it assumes that the agreement of August 10th, 1931, was the agreement under which the mortgages were assigned, whereas it was wholly collateral to that agreement and dealt only with rights of the Fidelity Company and the Trust Company in the assigned collateral. The actual agreement between the Fidelity Company and the Trust Company, under which the bonding companies abandoned their announced intention of seeking relief from liability as sureties on the depositary bonds, was made prior to the assignment of the mortgages to the Fidelity Company. Second, it fails to distinguish the difference between the formation of the contract under which the surety executed the bond and the continuance of that contract. An agreement to deposit collateral to indemnify the surety against losses which had occurred might well be regarded as a past consideration, while a promise to deposit collateral to protect the surety against losses which might occur in the future would not be so construed if the term of the bond was indefinite and terminable at the election of the surety. Third, it ignores the distinction between a promise founded on a "past consideration" and one founded partly on a past consideration and partly on an executory

consideration, for, while the former imposes no legal obligation, the latter may be enforceable. 13 *C. J.* 362. Fourth, it ignores the distinction between an executed and an unexecuted agreement to pledge, for, while an executory promise to pledge security for an existing debt is void for want of consideration, the contrary is generally held to be true of an executed promise to pledge such security (49 *C. J.* 906), although the cases are divided, as to whether that fact will affect the status of the pledgee as a holder in good faith. 49 *C. J.* 929.

Good Faith. The Uniform Sales Act, Code, art. 83, sec. 97, subsec. 2, provides that within the meaning of the subtitle a thing is done in good faith when it is in fact done honestly, whether it be done negligently or not. The transaction under consideration, strictly speaking, was not a sale within the definition of the Uniform Sales Act, *Id.,* sec. 97, subsec. 1, but rather in the nature of a pledge (21 *R. C. L.* 648), so that it is not affected by the mandate of the act which excludes negligence as a factor in determining good faith, but rather falls under the principle stated in *Biddinger v. Wiland,* 67 Md. 362, 10 A. 202, that sufficient knowledge to arouse suspicion as to the right of the Trust Company to transfer the mortgages charged it with notice. That was a case of vendor and purchaser, but the principle stated there was recognized as controlling in *Patapsco Nat. Bank v. Meads,* 131 Md. 576, 102 A. 993, where the court dealt with the unauthorized pledge of bonds to a holder in good faith. In that case the pledge was upheld, but the court distinguished it from *Taliaferro v. First Nat. Bank,* 71 Md. 204, 17 A. 1036; *German Savings Bank v. Renshaw,* 78 Md. 475, 28 A. 281; *Merchants' Bank v. Williams,* 110 Md. 334, 72 A. 1114, on the ground that in each of those cases the nature of the assignment put the pledgee on notice as to the right of the pledgor to hypothecate the securities. And, since an assignment of mortgages as collateral security is in the nature of a pledge, although having some of the incidents of a sale (49 *C. J.* 927), the reasoning of the court, in the cases last cited, as to what circumstances are to be considered in determining

whether a holder of such choses in action as stocks and bonds, transferred to him as a collateral security, acquired them in good faith, may apply with equal force to the assignee of a mortgage assigned for a like purpose. So it may be said that one who acquires property other than negotiable paper, to be held by him as collateral security for a loan or an obligation, under circumstances which would justify a reasonable doubt in the mind of an ordinarily careful and prudent man as to the right of the pledgor to transfer it, is not a *bona fide* holder, where the pledgor had in fact no such right.

Good faith, apart from the element of notice, with which it is closely identified, necessarily implies honesty of purpose, and the absence of any intention to use the transaction to which it is applied to deprive others of rights or property to which in equity and good conscience they are entitled. 28 *C. J.* 715.

Apart from the question of notice or knowledge, which will be considered below, there is nothing in the record in this case to permit the inference that appellee acted in bad faith in acquiring the Smithsburg mortgages. That it was uneasy and apprehensive concerning its liability on the Trust Company depositary bonds, and that it intended to protect itself against loss on that account, as far as possible, is beyond doubt or question. It is also clear that as early as 1930 it had announced a definite intention of retiring from one of such bonds, and that by the middle of July, 1931, it had decided to retire from all the bonds unless secured against loss as surety thereon by the deposit of collateral security. Appellant assumes that that decision was induced by the belief that the Trust Company was insolvent, but the evidence does not support that assumption. The officers of the Fidelity Company stated that their action in demanding security or being permitted to retire from the bonds was grounded on these reasons: (1) Business conditions throughout the country had been bad, and were bad, there had been many bank failures, and the policy of the bonding companies was to reduce their lines of depositary insurance; (2) Coblentz, president of the Trust Company, had been indicted

in a federal court in connection with the operations of the
F. H. Smith Company, and they feared the effect of that
publicity on the Trust Company; (3) the Fidelity & Cas-
ualty Company of New York had demanded and received
collateral security for acting as surety on the Trust Com-
pany's depositary bond to the State of Maryland dated Jan-
uary 6th, 1931; (4) the United States Casualty Company
threatened to cancel its suretyship on other Trust Company
depositary bonds, and they feared the effect of that action
on the Trust Company's credit. The facts involved in these
reasons were of such a character as to compel the officials
of the bonding companies, as a matter of ordinary business
prudence and in the honest discharge of their official duties,
to do what they could to protect the corporations which they
represented, so long as they did not knowingly interfere with
the rights of others. The only steps open to them were to
retire from the bonds, or to require collateral as the price of
their continued suretyship. And, unless they knew, or should
have known, at the time, that the Trust Company was in-
solvent, their action in demanding and receiving collateral
security under the circumstances involved no element of bad
faith, but was done in the reasonable exercise of ordinary
business prudence.

Notice. The appellants next contend that the appellee
had knowledge, actual or constructive, of the insolvency of
the Trust Company at the time it accepted the Smithsburg
mortgages. It is not shown in the proof nor alleged in the
pleadings that it knew of the circumstances surrounding the
sale of the assets of the Bank to the Trust Company, nor
that it knew that the Trust Company was insolvent at that
time. But the gist of the complaint is that appellee should
have known that the Trust Company was insolvent when it
received the collateral security. It does indeed appear now,
from evidence contained in a record of nearly 1200 pages,
taken over a period of nearly six months, that the Trust
Company was insolvent at that time in the sense that its
liabilities exceeded its assets. But it would be manifestly
unfair, if not absurd, to require a surety to make an inves-

tigation so thorough and extensive of the business of its principal before it accepted collateral deposited to secure it against loss because of its liability as surety on the principal's bond. The evidence is insufficient to show that it had actual knowledge of the insolvency, and, to charge it with constructive knowledge, its conduct should be considered in the light of the circumstances as they existed at the time, rather than as they appear now. If the reports, statements, and other data concerning the Trust Company's financial condition, which one of ordinary prudence and sagacity should have demanded, before assuming so great a liability, or which were exhibited to the appellee, were sufficient to justify a reasonable doubt as to the solvency of the Trust Company, then the appellee may fairly be said to be chargeable with the duty of making such further investigation as may have been necessary to resolve the doubt. But the law places upon it no greater burden than that.

The evidence in this case shows that, at the time the Smithsburg mortgages were assigned, appellee had had before it the bank examiner's report of September, 1930, on the condition of the Trust Company, balance sheet and list of securities as of June 2nd, 1931, the report of an employee sent to investigate the condition of the Trust Company, and the oral statements of the Trust Company's officers. Not one of these documents or statements showed on its face that the Trust Company was insolvent, but, on the contrary, indicated that it was in sound financial condition. And not until after an extensive extrinsic investigation and analysis of the securities, loans and discounts indicated in the reports and statements as assets of the Trust Company did it appear that the values assigned to its assets were so far false and fictitious as to demonstrate the insolvency of the institution.

With the information available to it, when it took the assignments, it is impossible to charge the Fidelity Company with knowledge of the insolvency of the Trust Company, which at the time was a going concern, apparently meeting its obligations as they accrued, in view of the further fact that its insolvency could only have been known to a stranger

through an investigation so extended and expensive as to be wholly impracticable. With that information and other information not open to the appellee, George W. Page, the state bank commissioner, said that the company was solvent on June 29th, 1931; William J. Gerbig, state bank examiner, testified that it was solvent in June, 1931; C. Thomas Sumner, Grover L. Michael, officers of the Trust Company, said that it was solvent in June, 1931; Paul L. Wellner, an officer of the Fidelity Company, Hale Anderson, a vice-president of the Fidelity & Casualty Company, and Nathan D. Mobley of the U. S. Casualty Company, did not believe in July, 1931, that the company was insolvent. And, finally, the complainants in this case, who contend that the appellee should be charged with notice, actual or constructive, of the insolvency of the Trust Company, with the same sources of information open to them as were open to it, sold practically the entire assets of their bank to the Trust Company upon the assumption, not only that it was solvent on June 29th, 1931, but that on that date it had a combined capital and surplus of over $3,000,000.

From these conclusions it follows that the Fidelity Company acquired the Smithsburg mortgages in good faith, for value, and without notice of any infirmity in the title of the Trust Company from which it received them, and so much of the decree appealed from as is involved in the appeals in Nos. 61 and 63 of this Term will be affirmed.

> *So much of decree appealed from as is involved in Nos. 61 and 63 of the October Term of this court is affirmed, with costs to the appellee.*

PARKE, J., filed a dissenting opinion, as follows, in which SLOAN, J., concurred.

The record in these appeals makes three bulky volumes. It is impracticable as it is futile to give a detailed presentation and analysis of the facts which have prevented the writer

of this dissent from an agreement with the major conclusions of the majority of the court. The writer is convinced by the record that the purchase of substantially all of the assets of the People's Banking Company of Smithsburg by the Central Trust Company of Maryland on June 29th, 1931, was procured by the fraud of the trust company practiced upon the bank by falsely and wilfully misrepresenting to the bank that the trust company was then solvent and in a strong and prosperous financial condition. The transfer of the assets of the bank, the deceived seller, to the trust company, the buyer, which had procured the sale and transfer by its actual fraud, was, upon the discovery of the fraud by the seller, incontestably voidable by the seller so long as the assets sold and transferred were held by the trust company, and the seller's right of rescission had not been lost by laches.

Furthermore, with respect to a non-negotiable chose in action, the debtor under the obligation has the right to avoid a contract of assignment of such chose in action on the ground of fraud as against a third party, who, without notice, in good faith, and for a valuable consideration, has acquired title to either a non-negotiable chose in action or a negotiable chose in action, after maturity, because the assignee or transferee succeeds, in either of these instances, to the rights of the assignor only and, so, cannot enforce or retain a right or title which his assignor could not enforce or retain against the original debtor. *Central Bank of Frederick v. Copeland,* 18 Md. 305; *Butler v. Rahm,* 46 Md. 541, 549; *Cumberland etc. Co. v. Parish,* 42 Md. 508, 613, 614; *Steele v. Sellman,* 79 Md. 1, 6, 28 A. 811; *Goldsborough v. Cradie,* 28 Md. 477, 487; *Timms v. Shannon,* 19 Md. 296, 314; *Harwood v. Jones,* 10 G. & J. 404, 420, 421; *Tyler v. Abergh,* 65 Md. 18, 20, 3 A. 904; *Kemp's Excx. v. McPherson,* 7 H. & J. 320, 336; *Estep v. Watkins,* 1 Bland, 486; *Avirett v. Barnhart,* 86 Md. 545, 39 A. 532; *Hunter v. Chase,* 144 Md. 13, 123 A. 393; *Schenuit v. Finance Corp.,* 148 Md. 403, 414, 130 A. 331.

The doctrine thus stated was not invariably confined to the case of the original debtor party to the non-negotiable chose

in action enforcing his equity against an assignee, but in England, and some of the courts of this country, it also applies when the same non-negotiable chose in action has been successively assigned and there were subsisting equities between the original assignor or any subsequent assignor and his immediate assignee in favor of the prior assignor. *Pomeroy's Equity Juris,* secs. 707, 708.

The theory stated is founded upon the fact that the holder of a non-negotiable chose in action cannot transfer anything but the beneficial interest he possesses. So, the measure of the assignor's subsisting beneficial interest is the limit of his capacity to transfer. When, therefore, the original assignment is procured by fraud, and a second assignment is then made by the guilty assignee to a purchaser for value and without notice, the innocent assignee, for value, obtains the thing assigned, subject to the equities subsisting against his assignor by reason of the fraud whereby his assignor procured the title to the chose assigned. There is no injustice in enforcing these subsisting equities against an innocent assignee for value and without notice, since the purchaser of a non-negotiable chose in action is, by the nature of the thing assigned, charged with the knowledge that the title he acquires is subject to the subsisting equities of the owner from whom his immediate assignor acquired his beneficial interest by assignment. *Supra.* See *Byles v. Tome,* 39 Md. 461; *Eversole v. Maull,* 50 Md. 95, 104; *Farmers' & Merchants' Nat. Bank v. Anderson,* 152 Md. 641, 137 A. 367; Compare *Ohio Life Ins. & Trust Co. v. Ross,* 2 Md. Ch. 25, and *Nat. Bank of Bristol v. Balto. & O. R. Co.,* 99 Md. 661, 59 A. 134.

However, a contrary view has been adopted. The non-apparent equitable rights of a prior assignor have been called latent, and the theory that such latent equities cannot prevail against the title of a second or subsequent assignee of a non-negotiable chose in action, and that an assignee only takes subject to the equities in favor of the debtor party, has had strong support in the decisions of the courts of the United States, and is now embodied in the *American Law Institute Restatement of the Law of Contracts,* sec. 174, as

the preferable doctrine. The prevailing opinion of this court adopts this view, which the writer accepts because of the desirability of uniformity of decision on this controversial point. *Selected Readings on the Law of Contracts*, 734, 735, 736.

The mortgages were non-negotiable choses in action, which the trust company had procured from the bank by fraudulent misrepresentations. The proof that the trust company procured the assignments through fraud casts upon the pledgee the burden of showing that these mortgages had been assigned to it without any knowledge of the fraud and for a valuable consideration, and in good faith.

On June 29th, 1931, the bank transferred its assets to the trust company, and on September 3rd, 1931, the trust company closed its doors. It was insolvent before June 29th, 1931, and has so continuously remained. During this entire period its insolvent condition was easily susceptible of ascertainment by suitable inquiry or by an examination of its assets and liabilities. Without making such an inquiry or examination, the surety companies required and obtained on August 10th, 1931, from the trust company, the pledge of securities to indemnify the sureties against loss on account of the depository bonds theretofore given by the trust company to the State of Maryland to cover deposits of the State of Maryland made in the trust company.

The securities were listed, and the first item was a number of mortgages, whose aggregate principal amount was $130,150, which had been acquired by the trust company as part of the assets of the bank; the second item was another group of mortgages, whose aggregate principal amount was $50,150, which had been acquired by the trust company as part of the assets of the Sykesville National Bank; the third item was a further group of mortgages whose aggregate principal amount was $51,000, which the trust company had acquired from the Washington Trust Company of Ellicott City. The other collateral pledged embraced unlisted stocks and bonds whose value was not given, but had been represented to the sureties as possessing a large value, which did

not materialize. The mortgages pledged had a principal value of $231,300, and were given to secure depository bonds to cover a maximum aggregate of $325,000 to the state.

The trust company had been the depositary of the funds of the State, and to secure the payment of these funds had delivered to the State its bonds of indemnity, with corporate sureties. These bonds were not expressly limited in duration, but it was the custom of the treasury to require the surety to furnish yearly a certificate to the effect that the premium on the bond had been paid by the depository, and that the bond would be continued in force for another year from its anniversary date. On May 28th, 1931, the state treasurer addressed a letter to the trust company stating that the funds on deposit were $330,661.03; that the amount of the six depository bonds to secure this sum was $345,000; and that the bond of $75,000, with the Fidelity & Deposit Company as surety, would have to be renewed in full for another year before its anniversary date of July 1st, 1931. At that time the Fidelity & Casualty Company was the surety on a bond of $100,000, whose premium was prepaid to January 6th, 1932; the Maryland Casualty was surety on a bond of $20,000, whose premium was paid to June 20th, 1931; and the United States Casualty Company was the surety on two bonds, of which one was for $20,000, with premium paid to June 20th, 1931, and the other was for $100,000, with premium paid to November 7th, 1931. In addition to its mentioned bond of $75,000, the Fidelity & Deposit Company was surety on bonds of $25,000, with premium paid to December 23rd, 1931, and of $5,000, with premium paid to February 18th, 1932. Furthermore, the Fidelity & Deposit Company was the surety on a private bond of $75,000 given by the trust company to Washington Railway & Electric Company and the Potomac Electric Power Company. With three depositary bonds, aggregating $115,000, having anniversary dates on June 20th, and July 1st, 1931, the question of securing the sureties' continuation certificate for another year was immediate. The sureties knew that the Fidelity & Casualty Company had declined in December,

1930, to renew its bond of $100,000 so as to run for the year ending January 6th, 1932, until the trust company had previously pledged with the assurer collateral to indemnify the surety. They further knew that there had been a number of bank failures throughout the country, and that, consequently, the surety companies had adopted the policy of not renewing depositary bonds. The Fidelity & Deposit Company declined to renew its policy of $75,000 on July 1st, and the United States Casualty Company did not renew its policy of $20,000 by July 1st.

Under these circumstances, Emory L. Coblentz, president of the Central Trust Company, went on July 9th or 10th, 1931, to the offices of the Fidelity & Trust Company for the purpose of obtaining a renewal certificate of the $75,000 bond, which should have been renewed on July 1st, and renewal certificates for the other bonds on their respective anniversary dates. On this occasion the trust company offered to give collateral for these renewal certificates, as it had done in January, 1931, when the Fidelity & Casualty Company had exacted this indemnity. The executive officers of the Fidelity & Deposit Company took the position that, if they accepted collateral, it would inure to the benefit of all the sureties, and that the trust company would have to furnish satisfactory collateral to cover all the depositary bonds. The president of the trust company agreed to pledge the collateral; requested the Fidelity & Deposit Company to assist in obtaining the co-operation of the other bonding companies; and stated that he would submit a list of securities for approval.

On July 11th the trust company wrote a letter in reference to the collateral and stated, through its president: "In looking over the securities which we have, I find, as I rather expected, that all of the quickly marketable securities have been used for direct borrowing purposes." The letter then suggests as collateral one thousand shares of the Continental Life Insurance Company of Richmond, an unlisted stock, whose par value was $10 a share, and mortgages on real estate. In addition to the revelation that the trust company

has used all of its "quickly marketable securities" for the purpose of "direct borrowing," it disclosed that the trust company had pledged its similar mortgage liens, which are not liquid assets, with life insurance companies. As a result of communication over the telephone, the president of the trust company wrote on July 15th to the Fidelity & Deposit Company, and inclosed a list of mortgages, aggregating $130,150, on land in the vicinity of Smithsburg, that had been taken over by the trust company "when it assumed" the "deposits a week or two ago" of the People's Banking & Trust Company of Smithsburg. The letter, also, proposed to increase the pledge of the life insurance stock to two thousand shares, which the writer valued at $50 a share, and expressed the opinion that, with the $50,000 (estimated) collateral given in January, 1931, to the Fidelity & Casualty Company, the new collateral was ample.

These communications were received by George L. Radcliffe, first vice-president of the surety company, who, on the assurances of the two letters and the conversations over the telephone, authorized on July 16th the execution of the renewal certificate of the $75,000 bond, dating the certificate back so as to cover the period for July 1st to June 30. Radcliffe sent Paul L. Wellener, a vice-president in charge of the depository department, to New York to confer with the two surety companies there. Wellener reported to Radcliffe on his return on July 23rd, and the next day Radcliffe wrote to Coblentz a long letter in which he reported considerable uneasiness among the insurers; and that one of them was preparing to take immediate steps to retire, that there was some reluctance to accept mortgages, but that the companies finally agreed to accept them as collateral, but felt that the assignments should be recorded; and that the arrangement made contemplated the trust company putting up one hundred per cent. of value in collateral for every dollar of state suretyship outstanding; and that the collateral deposited should be satisfactory in character and value to the Safe Deposit & Trust Company, which should have the details in charge.

Two of the concluding paragraphs of the letter should be quoted:

"One of the New York companies was particularly reluctant to agree definitely to carry on, because they have experienced the cancellation of a considerable amount of reinsurance which they had heretofore depended upon, and this company in question did not feel that it could afford to increase its liability, even though it might be protected by collateral.

"We feel reasonably assured, however, that if you can send us adequate collateral for the full amount of suretyship outstanding that there will be no further cancellations at this time on the part of anybody. Naturally we acted merely in the capacity of a messenger in dealing with the New York Companies, and we cannot guarantee that they will continue their suretyship indefinitely, but certainly if collateral is put up promptly, *we believe there will be no disturbance of the situation while your own problem remains acute.*" (Italics the writer's.)

The following day, July 25th, Coblentz wrote to Radcliffe acknowledging the receipt of this letter by the trust company, and promising to submit the list and stating:

"I did not expect we would be required to put up 100% in value of collateral for every dollar of State suretyship outstanding, for this gives no credit whatever to any of the bank's other assets.

"* * * What we will offer you as collateral security may not be stock exchange collateral, but I assure you it is good and will protect everybody absolutely.

"* * * It would be helpful to our general situation, if you would not record the assignments, but we must, of course, submit this decision to your judgment."

After July 25th the details of the transaction were in charge of Wellner and other officers of the Fidelity & Deposit Company. The continuation certificate of the bond of the United States Casualty Company for $20,000, extending the bond for another year from June 30th, 1931, was

delivered by messenger to the treasurer on July 30th, 1931. The agreement in writing was not executed, however, until August 10th, and the assignments of the mortgages are dated on August 19th, 1931. These fifty mortgages date from August, 1913, to February, 1931.

The facts here narrated, together with those which are set forth in the opinion of the majority of the court, force the writer, notwithstanding his respect for the judgment of his associates, to conclude that the Fidelity & Deposit Company, and the surety companies for which it was agent, are charged with knowledge of the insolvency of the trust company at the time of the pledging of the collateral. It is quite true that certain officers of the trust company, and George W. Page, state bank commissioner, and William J. Gerbig, one of the state bank examiners, testified that the trust company was solvent in June, 1931, but the facts of this record quite deprive such expressions of opinion of any evidential weight. Nor does the belief of Wellener, the vice-president, nor that of Nathan D. Mobley, an officer of the United States Casualty Company, that the trust company was solvent in July, 1931, relieve their companies of the effect of the facts within the knowledge of the surety companies.

If it be granted that the officers of the surety company did not have actual knowledge of the insolvency of the trust company in June, 1931, the collateral facts here stated within their knowledge put them on inquiry. The trust company sent them, about ten days prior to July 1st, 1931, with the September, 1930, state examiner's report, a June 2nd, 1931, balance sheet of the trust company, and a list of the stocks and bonds of the company. Although an examination was made on June 22-26, 1931, the surety company was not furnished the report of the examination. The stock and bond list was not checked nor verified with respect to the "market" values noted, although it required no special financial knowledge to perceive that a valuation was necessary before any weight could be attached to the figures. The bank examiner's report of September, 1930, was not a reliable guide to the

financial condition in June-August, 1931. Nor did the balance sheet of June 2nd, 1931, afford any reassurance in a banking situation which the Fidelity & Deposit Company characterized as "acute" on July 24th, 1931, while the matter of the bonds was in course of treaty.

Turning again to the examiner's report of 1930, it will be observed that the liability of the trust company for bills payable and on rediscounted paper was $1,010,029.18; that some of its directors were heavy borrowers and indorsers. Nineteen of the twenty-four directors owed an aggregate of $859,931.23 as makers and $10,443,782.88 as indorsers. Exclusive of duplications of $312,656.80 as makers, and $7,726,927.98 as indorsers, their net liability was $547,-274.43 as makers and $2,716,854.90 as indorsers. The Blue Ridge Investment Company owed $1,792,762.22; the Central Securities Company, $2,375,569.36; the Guarantors' Investment Corporation, $1,021,287.82—or a total for the three corporate borrowers of $5,189,619.40. The examiner noted in his report that these loans were "work out conditions and the greater portion of them represent their notes for other assets, which were originally included among the assets of the Trust Company." These assets were considered undesirable for the trust company to hold, and the corporations named had been formed to take them out of the trust company, as the surety company knew from a report made by its representative on December 20th, 1929. The report further showed that the trust company had 5,872 of its own stock pledged. One of its directors operated two syndicates for the sale of the trust company's own capital stock, carrying in one account 665 and in the other 2,668 shares. No interest was paid on the larger account. So, the examiner's report of June, 1930, showed a bad financial condition, and could not be accepted as establishing the financial condition of the trust company in June-August, 1931.

The obligation of the trust company was that it should safely keep and have forthcoming when required all of the deposits made by the State. The record establishes that, during the period from June 1st, to September 3rd, 1931,

the State could not have withdrawn its large deposit because of the insolvent condition of the trust company, and that the surety companies would be liable on their respective bonds on account of this insolvency.

Their course is consistent throughout with the belief that, because of the assured's financial condition, it was not a safe risk for them to continue on the depositary bonds of the trust company unless they were fully indemnified by the pledge of collateral in the amount of the bonds. With all their information on this subject, it would have been the duty of any reasonable man, in a similar situation, to follow the matter and ascertain the true state of facts. The exercise of proper diligence in inquiry would have certainly led to the discovery that the trust company was insolvent; and that the proposed assignment to them of the listed securities was, not only an impairment of the capital resources of the trust company, but also the wrongful conversion of the mortgages lately obtained from the bank through the fraudulent misrepresentations of the trust company. The neglect of the surety companies to make this inquiry undoubtedly charged them with the knowledge of what they would have obtained by the employment of reasonable diligence. *Bank of Bristol v. Balto. & O. R. Co.,* 99 Md. 661, 676, 59 A. 134; 2 *Pomeroy's Equity,* sec. 597.

The power conferred upon banks and trust companies to deposit securities for the purpose of securing deposits of the federal and state governments, and of the agencies of the first and the political subdivisions of the second, or to secure the sureties on bonds furnished to secure such deposits, was not intended to apply to the case at bar, and affords no protection to the surety companies, because the question is not one of authority to pledge, but a contest between a defrauded assignor and its fraudulent assignee and the latter's surety, which, with knowledge of the fraud, has received as collateral security the choses in action obtained from their first assignor through the fraud of its assignee. Acts of 1931, ch. 429.

The knowledge here imputed to the sureties would bar their

relief, and, so, would make unnecessary a reference to section 8 of article 90 of the Code. It would seem that, upon a surety giving notice of its desire to be relieved of its liability, the duty imposed by the words, "the State Treasurer may, in his discretion, immediately demand of such bank a new bond with good and sufficient surety or sureties," is simply to empower the officer either to demand or not to demand a new bond, as the treasurer may, in his discretion, determine. *State v. Knowles,* 90 Md. 646, 655, 45 A. 877, 49 L. R. A. 695.